May it please the Court, my name is Linda Larson, and with me in the courtroom is my colleague Jessica Farrell. We represent the plaintiff Appellant's Fishermen's Finest and its associated companies. Appellants fish year-round for Pacific cod and other ground fish in the federal fisheries off the coast of Alaska. Their two vessels are part of what's known in regulatory terms as the non-AFA trawl catcher processor sector, and more colloquially as the HNG sector, because what they primarily produce are headed and gutted fish products. Fishermen's Finest has experienced severe adverse impacts and instability in the conduct of its fisheries as a result of Amendment 85. It has lost the directed cod fishery that it has fished in for over 20 years, and it has drastically changed its other operations and become more inefficient in order to preserve its cod allocation as incidental catch and to avoid being shut down in its other fisheries because it operates under a hard cap, which means that when it reaches its cod allowance, it must shut down in any other fishery in which it could potentially catch cod. The Secretary of Commerce did not do any analysis to predict this result, let alone provide a rational explanation for it or mitigate against it. They had a policy explanation. They just decided to shift basically income, redistribute income from companies such as the Appellant to smaller fishing boats and native communities in southeast Alaska. That does considerable violence to the economic expectations of the victims of the change in policy, but I'm just not clear on why they can't do that. You don't have a property right to a government policy. I agree that you don't have a property right to a government policy. However, there are government policies in the form of the National Standards under the Magnuson Act and in the form of Section 211A of the American Fisheries Act, which says that we need to look at the scientific evidence, but it looks like they did. Well, Your Honor, I actually believe that they didn't because what they did was they looked at a set of years that included a regulatory regime that is no longer in effect. In other words, by considering the pre- Well, they gave a reason for looking at those years. They said things were different before those years and we only have partial data after those years. As for whether those are good reasons, bad reasons, I don't know if we're the reason choosers, as long as the reasons aren't arbitrary and capricious. Well, Your Honor, the reasons were arbitrary and capricious for two reasons. First, because they entirely failed to consider an important aspect of the problem. In other words, they did not do the analysis under Section 211A of the American Fisheries Act to determine what the impact on non-AFA fishers would be as a result of increasing an allocation to the American Fisheries Act hauler fleet. Second of all- They, in fact, increased an allocation to the AFA category. I'm sorry, I didn't hear the first part. As I try to trace through it, it looks to me like the number assigned- different things are going on at different times, so I've tried to unbundle this. One of the things that was done was divide the category between AFA and non-AFA. Correct. So working backwards gets tricky. But as I try to work backwards, I don't see how the- I understand how in the sort of negotiations to come out with the current allocation, the AFA number went up. But when you compare the AFA number that emerged from what you're challenging here, it appears actually to be lower than the number that was in effect before. So I understand the adverse impact on your client, but I'm not sure I understand how that results from favoring the AFA category when, in fact, their number went down. Okay. Well, the first thing to clarify is that their number did not, in fact, go down. The council's problem statement says that they're going to base the allocation on catch history as modified by socioeconomic and community factors. If you look at catch history as opposed to harvest levels, which is what the government wants you to look at, their catch history, in fact, was decreasing over time. And depending on whether you look at it with or without fish meal, it was either 1.6% to 2.1%, or it was 0.9% to 1.5%. But it was not 6.3%. 6.3% was a harvest level that was set by the American Fisheries Act, but it was just that. It was a level. It was not what they were catching. And the relevant factor is what were they catching? They were catching only their incidental catch to the tune of less than 2.1%. So when you give them an allocation of 2.3%, you are, in fact, giving them an allocation that's higher than their actual catch history, not their harvest limit, and allows them to keep their incidental catch to conduct their pollock monopoly and, in addition, gives them the ability to have a directed cod fishery in the non-pollock fishery. In contrast, Fisherman's Finest, which Congress ejected from the pollock fishery, legally fished up toward that 23.5% amount that they were allowed under Amendment 87, and they were forced to do so because that was the fishery that was left to them. And even the Secretary admits that in the post-AFA world, they were catching 15.3% to 16% of the cod, and yet they received an amendment under Section, under Amendment 85, a 3.4%, which had the effect of making them conserve their incidental catch in their other directed fisheries so that they would not be shut down. And the result was they lost the directed cod fishery that they had very well established. They were one of the first companies, American companies, to actually fish for cod. So there's no question that they were long-time and very dependent fishermen in this fishery. This is really hard for somebody who doesn't know anything about the fishing industry to understand. And I would love to answer your questions. Are you saying that even though the number went down, or even though the AFA number went down, in terms of actual fish, the AFA vessels would be getting more fish because of changes in other regulations? Let me try this again. Let me see if I can restate that. Okay. My understanding, what you've told us, is that the allocation or quota or limit previously applicable to the AFA category combined with the non-AFA, the trawler CPs, was much higher. That was broken apart in the most recent allocation. Correct. But that the AFA category never used more than a small portion of the percentage that might have been attributed to it before. You mentioned the 6.3%, which is really a ceiling. It wasn't actual use. And so what you're saying is that, if I understand correctly, their actual take was never as high as their limit. Their limit was brought down, but it's still higher than what their former historic take was. Whereas for your clients, you've got a quota now or an allocation that's lower than the historic take of the non-AFA. That's exactly right, Your Honor. So did that answer your question? Thanks. Okay. So I would like to turn to the issue of whether they used the best available science and whether the court needs to defer to their determination about that science. We believe that is one of the critical flaws of Amendment 85, because the agency has actually not articulated a rational basis for its choice of years to calculate catch history. We contend that you can only gauge the impacts of the American Fisheries Act and the American Fisheries Act co-ops in the post-AFA world by looking at the behavior after 1998. Congress instituted an incredible change in these round fish fisheries when it created the Pollock monopoly, but it provided that. Pollock monopoly? Are you talking about the IFQ system? No, I am talking about the fact that under the American Fisheries Act, 20 large Pollock vessels were given the exclusive right to conduct a directed fishery for Pollock in the Bering Sea Aleutian Islands area. Everyone else had to leave. As a mitigation to that, in Section 211A, the Congress stated that the North Pacific Council was to make conservation and management recommendations to the Secretary to protect non-AFA participants from any adverse impacts due to the AFA itself and the Pollock cooperatives. And that is what we contend that they did not do here because, for one thing, they looked at a series of years of catch history and included that in an average when that system was not in place. Section 211A requires them to look at the post-1998 world and decide what people's actual catch behavior was in those years. And here, the agency gives a bunch of seemingly technical explanations for why it was unable to do that and why it was more reliable to look at the pre-AFA years. But that's all. I hate to use this. I can't avoid it, though. That's a red herring. I've been trying to think of how to say that without doing it, but it just pops out. Gee, I thought that was about cod. I know. The agency violated National Standard 2 of the Magnuson Act, which requires them to look at the best available science because it chose not to update its comparable database to include the years 2004 to 2005. They had before them exactly the same information. They had the raw data that the fishermen were submitting in the form of weekly production reports and fish tickets, and they could have compiled a compatible database across all sectors, just as they did for the years 1997 to 2003. But they chose not to do it, even though they had two years from the time they started deliberations until they took final action in April 2006 to make that calculation. It's number crunching. It is not highly scientific. It is not predictive. It's looking at past behavior and doing some arithmetic, and this Court can do that just as well as they can. I understand there are different complaints about different years. Right. I want to make sure, again, I'm having trouble working through all this. If I understand correctly, you've got complaints about years at the front end that were included before the AFA went into effect. Correct. What years are those? Those are 1995 through 1998. And is it through? We're talking three years or four years here? Is it 95, 96, 97, or 95, 96, 97, and 98? I believe it includes 1988 because the AFA was passed in 1988 and went into effect on January 1, 1999. And there's also a complaint about the failure to encompass subsequent years after 2003. Correct. Which years are you focusing on here? Is it just 2003 or 2005? 2004 and 2005. Okay. And as I said, the Court doesn't need to defer to their judgment not to include 2004 or 2005 because they had the means to do the calculations to include it in the database. It's arithmetic. It's not predictive. It's just going back. Two reasons for not considering them, didn't they? One reason was that the data were partial, and the other reason was that the parties had incentives to act differently from the way they otherwise would in order to manipulate the allocations. Well, starting with the second, the parties really had no choice but to continue after they were removed from the pollock fishery to fish in those fisheries in which they were legally permitted to do so. So, of course, they did increase their effort in the cod fishery because that's what they were allowed to do at that point. So I think it's grossly unfair. I'm not suggesting there's anything wrong with them getting all the fish they were allowed to take. They've got to make a living. Correct. And then the partial data set issue actually goes away after 1998 because prior to 1998, some people were allowed to legally, including my clients, were legally allowed to discard cod. After 1998, cod becomes a mandatory retention species, and everybody has to keep it, and everybody has to count it against their allowances. So that's another issue that goes away if you just look from 1998 or 1999 onward and gives you a more accurate picture of the present participation in the fishery and the present dependency, which is what the council said it was actually trying to do with this amendment. Was there a concern about the later years, 2004 and 2005, based on discards? I'm flipping through. I have a note on something. I'm not sure I'm reading that correctly. No, that's what I was just saying. As of 1998, everyone had to keep their cod, all of their cod, whether they were targeting it or not, and that counted against their allowance. So in terms of retained catch, you've got a very clean database all the way through. What was the cited reason for saying the 2004-2005 numbers were not sufficiently reliable? I know they had some reason. At this moment, I can't tell you what it is. Maybe you can tell me, or your opposing counsel will, I suspect. I'm sure he'll tell you. I think it was the two reasons that we were just discussing. Thank you, Your Honor. Thank you, counsel. Good morning, Your Honors. May it please the Court, Charles Scott from the Justice Department on behalf of the Secretary of Commerce. With me at counsel table is Lawrence Smoker of the National Oceanic and Atmospheric Administration's Office of General Counsel. The Amendment 85 allocations were designed to address historic uncertainty in the Pacific cod fishery, as well as to take into account socioeconomic and community considerations pertaining to the entry-level gear sectors that provide opportunities for coastal Alaskan communities. The plaintiffs are trying to make this a case about how much did the head and gut sector get versus how much did the AFA-TRAL-CP sector get. But the action was much broader than that. It was about addressing uncertainty throughout the sectors and taking socioeconomic concerns into account. And NIPS did determine that the reallocations would have the effect of addressing uncertainty and would take into account those considerations. Because I've been working hard and working through this, let me tell you my factual understanding and ask you to tell me where I may be off base. And if I am off base, if I'm not off base to the extent that I have it, why it is the agency can do what it did. I understand that you've got a difficult job here, the agency does here, there's always going to be somebody aggrieved when there's an allocation. But I do have a feeling that this sector in particular got squelched. Let me tell you why my factual sense is of that nature. Two big factors. The first is the AFA versus non-AFA. And this is the dialogue I just had with opposing counsel. It appears to me that the number given to the AFA sector is, in fact, higher than its historic catch of COD. The number given to the non-AFA sector is, in fact, lower than its catch of COD at least since the AFA went into effect. Is that factually correct? I think that the 2000 through 2003 percentage, which is addressed on pages 61 to 62 of the volume three of the excerpts of records, say that it was 16% for the head and gut sector. And just one minute, I'll check. I mean, the thing is even simpler than that. I'm looking at your brief, which the record may have broken it out better. I may not have found the right page. But the 16% I've got someplace, and that compares with the A85 figure for the non-AFA trawl category of 13.4. So the allocation in A85 is lower than this sector has been historically catching at least the last few years. The allocation matches the amount that they have been catching since 1995. Well, that gets me to another issue. I'll get there eventually. I'm speaking now of since AFA went into effect, which is what Section 211 would speak to. It appears to me that the effect of the most recent allocation is to reduce this sector to a number less than their catch since AFA went into effect and to give the AFA category a number higher than they had historically. Your Honor, I don't know how the numbers break out completely between the year 1999 and the year 2005, which I think is what you're asking about. What I can tell you is 2000 through 2003, I know the head and gut sector had, I think, 16%. The AFA trawl CP sector had 1.5%. Well, if you take those, then my proposition is correct, because the allocation given versus 16% is 13% and versus 1% is 2.3, I believe it is. So it appears to be the case, according to the years you're looking at, that the AFA sector has been given an allocation higher than they actually caught, and the non-AFA sector has been given an allocation less than they actually caught. I'd like to get into the number, your reference to what they actually caught. Recall that in 1995 through 1997, these sectors were catching plenty of cod, but they weren't keeping all of it. I think in 1995, these sectors... Let me stop you there, because the other thing I want to deal with, and I'm going to stop you now, because I want you to expound, but based on your understanding of my concerns. I look at the numbers that were used, 1995 to 2003, and I say two things, both of which came up in the last argument. First, how can you use the pre-AFA years, because the circumstances changed so substantially for this category with the adoption of the American Fisheries Act? And second, how can you disregard what's happened subsequently? If you look at the long-term trend, it's apparent that this category, the non-AFA trolls, CP, whatever they call themselves, steadily going up in cod, because they can't go pollock anymore. Sure. And this standard applied to them closes their eyes to the fact that the historic average, they're given their historic average, only it's a historic average calculated with three or four years included, the pre-AFA years, which they can't go back to, because they can't catch directed pollock anymore. First, there have been reallocations in this fishery ever since 1995. Every year since Amendment 24 was passed, there have been reallocations from the trawl sectors to other sectors. The measure was designed to address actual historical dependence and use of the resource. That does mean going back to 1995. Why? Well, in part because if you look at page 312 of the excerpts, 3 colon 12 of the excerpts of record, some sectors were able to discard large amounts of Pacific cod before 1999, I believe. And that means that their numbers of total of retained catch for 1995 through 1997 are lower than the amount that they caught, considering that there are also discards. So needing to look at... But that doesn't tell me you should use a time period when they do something different than they're allowed to do now. I mean, if anything, that would suggest you don't use years before 1999 because practices were different. Bycatch is a consideration. Congress has directed that bycatch be a consideration under National Standard 9 of the Magnuson-Stevens Act. But that says nothing about what they can do today. I mean, the current allocation is based on what they can do today under existing law. And you're telling me that you're going to calculate that current number based on what they did at a time they behaved differently than they're allowed to behave today. What's the logic in that? The logic, again, is that the Council was looking at historical dependence on the resource, and they have had reallocations from their sector ever since 1995. I would like to address the second part of your question, which was the recent trend, the fact that in 2004 and 2005 they had an increased amount of cod. Judge Kleinfeld referred to this. There were two explanations that the government provided for why the 2004 to 2005 data were considered but not relied upon in establishing the allocations. The first was, 1995 through 2003, the government had hard numbers. What was the weight of ground fish legally retained? For 2004 and 2005, the data was available in a certain format, but it relied heavily on observer estimates and extrapolation. It didn't treat all sectors equally, because it wasn't, unlike the 1995 through 2003 data, hard weight data. Council has said that, well, the data were available, you just didn't do the calculations necessary to get to them. I have been told that, for example, the Alaska Department of Fish and Game fish tickets that are part of the raw data from which weight is actually calculated were only available as of March 2006. We're talking about a stack of papers saying, this processing plant processed X numbers of cod fillets during this week. I paid this fisherman X amount of dollars for Y amount of cod on that date. It's raw information that needs to be distilled and compiled into information. That's very precise information, those fish tickets. They tell how much fish of each type was caught and processed each day. My understanding, Judge Klein, yes, both the weekly production reports and fish tickets provide hard numbers. The fish tickets are from the state of Alaska, and I believe the way it works is when a processor buys raw fish from a vessel, they issue a fish ticket, a record of which is kept by both sides and submitted to the government in part for tax reasons. The weekly production reports are processors say, we processed a certain amount of Pacific cod fillets during this week. That was based on a total weight of Pacific cod delivered to us of that. So, yes, these numbers were hard data. Did the feds disregard the fish tickets? No. The 95 through 2003 data are based on the fish tickets and the production reports. The distillation of that information to actual weights wasn't available for 2004 and 2005. The second reason why the 2004 to 2005 data were disregarded, or excuse me, were not disregarded because they're throughout the record, they acknowledge the recent trend that Judge Clifton referred to of increasing catch. The head and gut sector, ever since at least 2000, has had essentially a shared allocation of 23.5 percent that they share with the AFH raw CP sector. And they have never been constrained by that allocation. Even their highest level of catch, which I think was 19.6 percent in 2004, they were never constrained. Other sectors were. The uncertainty that this problem, that this regulation was directed at was, other sectors think that there are going to be reallocations during the year that they're going to get to take advantage of, but they don't know. That's the uncertainty. That's why the allocations were changed. The head and gut sector was never constrained. And so that they could essentially fish for Pacific cod increasingly, whereas other sectors didn't have the advantage of being able to do that. The government said it would not be equitable to disregard the fact that some sectors can't do what the head and gut sector did, fishing for more in 2004 and 2005. And I would like to point out that. I accept that factually. But if the current allocations are supposed to be based on historic catch, there needs to be some explanation for why this sector is assigned a number substantially less than historic catch, not just for 2004, 2005, but you give me a number for 2000 to 2003, 16 point something percent, and now they're assigned a number of 13.4 percent. I ran the numbers. That's factually true, first. And then second, I'd like you to address how it is that's not arbitrary and capricious. If the whole theory of this is it's based on historic catch, and in fact 13.4 isn't based on recent historical catch. It's not based on it. The council and NIMS have explained this is not based on recent catch. By recent, I mean post-AFA. Well, we have at least four years of AFA data in there. Yeah, and you've got four years of pre-AFA data that moves the numbers down. You told me that 2000, 2003 was 16 point something percent. So you know if you take out the pre-AFA years where the number is like 13 percent, or the average for the whole period is 13 percent, the pre-AFA years just working through mathematics have got to be substantially lower than 13 percent. That makes a lot of sense because the AFA takes them out of Pollock and puts them in Codd. But how is it if we know that the 2000 and later figure, even disregarding 04 and 05, is 16 point something percent, how do you reach historic figure of 13.4 and say here it is? I mean it chops down their category by like a third. The data for 95 through 2003 were able to be equally comparable across all sectors. As far as the 2003. But wait. The AFA changed everything. What possible justification could there be to say you guys used to be able to catch Pollock. You can't now. But we're going to act like you still can for the quota purpose. This gets back to the question, the manner in which I was trying to answer referring to Judge Kleinfeld's question. The second rationale for disregarding the 2004 and 2005 data. I'm still looking at 2000, 2003. This goes to that as well, Your Honor. As I said, the head and gut sector, because they have shared this 23.5 percent allocation, which was set in 1996 or 97 and was based on the total amount of Codd caught, not the total amount of legally retained Codd. They have had an allocation ever since 1994 or at least 1996 that has been above, that has not imposed a constraint on their harvesting. They have been able to harvest effectively as much Pacific Codd as they want. Other sectors have not been able to take advantage of that. And in particular, the Yakitat case that we cite and Judge Kleinfeld's opinion in Alliance Against IFQs refer to the fact that it's fair under the Magnuson-Stevens Act's national standards to consider equity among sectors in the way this is being done. It goes beyond being just the best available science. We've explained why these were the best available science, because of their format, because they came from hard date, they were comparable across all sectors, whereas 2004-05 wasn't. The other element is from National Standard 4, fairness and equity. The government is required to treat the sectors equitably. Other sectors have not been able to take advantage of an allocation that is well above what they need, as evidenced by the fact that the head and gut sector has had reallocations, had reallocations every year since 1995. Other sectors don't get to do that. Away from them or away from them? Away from them. Okay. Opportunities away from them to the other sectors. Yes. I believe that it goes from the trawl gear sectors to the fixed gear sectors. That's in the Code of Federal Regulations. I'm afraid I'm not completely familiar with the hierarchy of reallocations. But it is based on the fact that they are not harvesting their entire allocation. And I think the reallocation regime has also changed in A85, but I'm talking about the previous situation. So the reason it's not arbitrary and capricious. The big winner in this, I mean, the hook and line CP, just looking at the chart in your brief, goes from A64, 40.8 percent, to A85, 48.7 percent. They get 48.7 percent, which is below their 1995-2003 average. So I wouldn't characterize anybody on this as winners and losers. It is, as someone said, it's difficult to come up with allocations that are going to satisfy everybody. They got below their 1995-2003 average. The head and gut sector got exactly its 1995-2003 average. And the AFA trawl CP got .1 above. I just want to say, saying that the reality is not that the AFA sector got more than their historical use, their allocation was reduced. In the past, they could harvest up to 6.1 percent of the TAC. Economic incentives change. The price of COD might go up. They might want to devote more effort to Pacific COD. They can't do that anymore. Their limit has been reduced from 6.1 percent to 2.3 percent. So even if the AFA were somehow applicable, and we don't think it is, there has been no competitive advantage granted to that sector. And I see I'm well over my time, so I'll thank Your Honor. Thank you, counsel. I think we went through all the time on both sides, didn't we? Fisherman's finest versus Gutierrez is submitted. Thank you, counsel. And we are adjourned for the morning.
judges: Alarcon, Kleinfeld, Clifton